UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED

AUG 0 3 2007

CLERK

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| JASON BOYLES, | * | CIV 04-4134 |
| | * | |
| Petitioner, | * | |
| | * | |
| -vs- | * | MEMORANDUM OPINION |
| | * | AND ORDER |
| DOUGLAS WEBER, Warden | * | |
| South Dakota State Penitentiary, | * | |
| | * | |
| Respondent. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Petitioner, Jason Boyles, filed an Application for Writ of Habeas Corpus by Person in State Custody, pursuant to 28 U.S.C. § 2254. Respondent filed an answer, Doc. 7, and a brief on the merits, Doc. 11. Boyles filed a Brief on the Merits, Doc. 18, and requested an evidentiary hearing. An evidentiary hearing was held on March 6, 2006 and was continued to May 18, 2006. For the reasons set forth below, the petition for writ of habeas corpus will be granted in part and denied in part.

## BACKGROUND

Boyles' first trial ended with a hung jury. During the second trial, Boyles was convicted in Millette County, South Dakota of second degree murder in violation of SDCL § 22-16-12. He was sentenced to life imprisonment pursuant to SDCL §§ 22-16-12 and 22-6-1. He filed a direct appeal, *See South Dakota v. Boyles*, 567 N.W.2d 856 (S.D. 1997), in which the South Dakota Supreme Court affirmed his conviction and sentence. He filed a petition for writ of habeas corpus in state court. An evidentiary hearing was held by the state habeas court, which will be referred to in this opinion as "the habeas hearing." The habeas court denied Boyles' habeas corpus petition. The South Dakota Supreme Court affirmed the denial of habeas relief. *See Boyles v. Weber*, 677 N.W.2d 531 (SD 2004).

The death involved in this case occurred during the early morning of August 10, 1995. Ronald Stranger Horse was struck from behind by a car while walking along a road south of White River. There were two eyewitnesses to Stranger Horse's death, Boyles and Harvi Lynn Sharp Butte, who were in the car that struck Stranger Horse. The car that struck Stranger Horse was owned by Petitioner's father, John Boyles. During Boyles' trial, Sharp Butte testified that Boyles was the driver. Boyles had no conscious recollection of the incident. Rather, Boyles was hypnotized and while under hypnosis, Boyles stated that Sharp Butte was driving the car when Stranger Horse was hit and that Sharp Butte stopped the car shortly after she hit Stranger Horse and ordered Boyles to drive back into town. Under hypnosis, Boyles stated that Sharp Butte said "watch this" before hitting the man with the Boyles' car and that she was scared after hitting the man. The video tape of Boyles' hypnotic session was shown to the jury during the first trial because the prosecution asked questions that "opened the door" to allowing it into evidence, but at the second trial the trial court refused to allow the jury to view the video tape. Dr. Mathias Stricherz, the hypnotist, was allowed to testify at the second trial about his recollection of Boyles' statements made while Boyles was hypnotized. But Boyles contends that Dr. Stricherz's testimony was a poor attempt to recall the specifics of what Boyles told him during the hypnotic session.

Sherry Two Hawk was one of the first witnesses to testify for the prosecution. She was in the Boyles' car with Boyles and her sister Nellie beginning about 12:30 a.m. on August 10, 1995. When they went to pick up Sharp Butte and her sister Tanya, Nellie wanted to go home because she did not like Sharp Butte. Sharp Butte had earlier beat up Sherry and Nellie's cousin. Sherry, however, was still friends with Sharp Butte. They were all drinking alcohol that evening and driving around. In Sherry's opinion, Sharp Butte gets mean and wants to fight others after she has been drinking alcohol. Sherry testified that from 12:30 a.m. until 5:30 a.m. when she went home, only Jason was driving the Boyles' car.

Another witness called by the prosecution, Antonio Fallis, is Sherry and Nellie Two Hawk's mother. Around 6 a.m. on August 10, 1995, she saw Sharp Butte and Tanya fighting in the street. Tanya ran down the street away from Sharp Butte, Boyles and the car. Sharp Butte and Boyles got

2

in the car and drove to where Tanya was. Fallis then saw Sharp Butte and Tanya in a second fight, where Sharp Butte hit Tanya in the face with her fist hard enough to knock her down and then Sharp Butte kicked Tanya in the head three or four times. Boyles then pulled Sharp Butte off Tanya and told her to stop fighting. When Boyles and Sharp Butte left the area of the fight, Boyles was driving the car. Fallis further testified that Sharp Butte has a reputation in the community for being untruthful.

Gloria Moran testified that she saw Boyles' damaged car driving by her home in Swift Bear while her husband was getting ready to go to work. She could not see who was driving the car but she could see that the windshield was damaged on the passenger side. From a distance, Moran saw Sharp Butte get out of the passenger's side of the Boyles' car. Sharp Butte was scared when she talked to Moran. Sharp Butte told Moran a man had been run over. Moran took Sharp Butte into her home and called the police. Sharp Butte told Moran not to mention her name when Moran called the police.

Mike Moran, Gloria's husband, also testified at Boyles' trial. He was preparing to go to work when he saw Boyles' damaged car outside his house at approximately 7 a.m. the morning Stranger Horse was killed. He did not see who was driving the car or whether Sharp Butte got out of the passenger or driver's seat. Sharp Butte came into the Morans' house with Gloria. He then said that he told them to call the police because "[f]rom the damage on the car and her telling me she hit somebody, I thought they would need help." (Gloria Moran and Mike Moran T.[1] at 47.)

Additional trial testimony will be summarized below as it pertains to each of Boyles' claims. In his § 2254 petition, Boyles contends he is entitled to habeas relief based on the following grounds: (1) ineffective assistance of counsel for failing to investigate, which resulted in counsel not learning of exculpatory witnesses, including Tony Valandra, and failing to present testimony from such

---

[1]Some of the testimony from the second trial was transcribed separately. References in this opinion to such transcripts will be to the name of the witness, followed by "T." and a reference to the page number of that transcript.

witnesses and Dawn Andrews; (2) a new trial should have been granted based on newly discovered witnesses; (3) ineffective assistance of counsel for failing to appeal exclusion of Boyles' video-taped hypnotic memory recall session; (4) ineffective assistance of counsel for failure to properly cross-examine the State's glass fracturing expert; (5) ineffective assistance of counsel for failing to object to vouching of Sharp Butte's trial testimony by FBI Agent Drew McConaghy, and for failing to request a cautionary instruction, move for mistrial or raise improper witness vouching on direct appeal; (6) ineffective assistance of counsel for failure to object to and appeal vouching by prosecutor during closing argument; (7) ineffective assistance of counsel for failure to adequately confront Sharp Butte with several prior and inconsistent statements; and (8) ineffective assistance of counsel for failure to object to and appeal denial of mistrial for use of material leading questions by prosecutor. The Respondent contends that Boyles is not entitled to relief under § 2254 on any of his claims.

## DISCUSSION

### I.    Standard of Review

A state prisoner can obtain federal habeas relief only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Supreme Court explained the standard for granting habeas relief to a state prisoner under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> [Section] 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied – the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal

4

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. "The state court's application must also be unreasonable." *Simmons v. Bowersox*, 235 F.3d 1124, 1130 (8th Cir. 2001) (citing *Williams*, 529 U.S. at 411). "Whether a state court's application was unreasonable is an objective inquiry." *Simmons*, 235 F.3d at 1130 (citing *Williams*, 529 U.S. at 411). In addition to relief under 28 U.S.C. § 2254(d)(1), a state prisoner's application for writ of habeas corpus may be granted if the state court's adjudication of the prisoner's claim on the merits "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In a § 2254 proceeding, the federal courts must presume the State court's determination of a factual issue is correct. *See* 28 U.S.C. § 2254(e)(1). To rebut the presumption of correctness, the § 2254 petitioner must do so by clear and convincing evidence. *See id.*

## II.    Ineffective Assistance of Counsel Claims

The Supreme Court set forth the standard by which claims for ineffective assistance of counsel are to be evaluated:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). The deficiency prong is met when the defendant shows that counsel's representation fell below the "'range of competence demanded of attorneys in criminal cases.'" *Id.* at 688 (quoting *McMann v. Richardson*, 397 U.S. 759, 770-71 (1970)). The prejudice prong is met when the defendant shows that " there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

5

been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The Court "must indulge a strong presumption that [trial] counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see Parker v. Bowersox*, 188 F.3d 923, 928 (8th Cir. 1999) (same).

Boyles claims that his trial lawyer was ineffective in failing to: (1) investigate and present witnesses tending to prove Boyles' innocence; (2) appeal denial of admission of video-taped hypnotic memory recall session; (3) properly cross-examine the State's glass fracturing expert; (4) properly cross-examine Sharp Butte; (5) object to and appeal issue of improper vouching or bolstering by FBI Agent McConaghy; (6) object to and appeal improper vouching by prosecutor; and (7) object to and appeal the prosecutor's improper use of material leading questions.

## A. Failure to investigate and present witnesses

"To establish prejudice from counsel's failure to investigate a potential witness, a petitioner must show that the witness would have testified and that their testimony 'would have *probably* changed the outcome of the trial.'" *Hadley v. Groose*, 97 F.3d 1131, 1134 (8th Cir. 1996) (quoting *Steward v. Nix*, 31 F.3d 741, 744 (8th Cir. 1994)) (emphasis added). "In evaluating the probability of a different result, the court must consider the totality of the evidence." *Siers v. Weber*, 259 F.3d 969, 974 (8th Cir. 2001) (citing *Strickland*, 466 U.S. at 695). "In conducting this analysis, [the Court] will consider: '(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution.'" *Siers v. Weber*, 259 F.3d 969, 974 (8th Cir. 2001) (quoting *McCauley-Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996)).

. Credibility of witnesses is crucial in this case. The South Dakota Supreme Court on direct appeal concluded that, "Boyles' conviction rests heavily upon [Sharp Butte's] word." *Boyles*, 567

N.W.2d at 862. On appeal of the denial of habeas relief, the South Dakota Supreme Court again recognized that, "[i]n large measure, it appears that the case hinged on whether the jury believed Sharp Butte's testimony concerning who was driving that evening." *Boyles*, 677 N.W.2d at 548. During the trial, Sharp Butte admitted she lied to FBI Agent Drew McConaghy. Agent McConaghy testified about the detailed lies Sharp Butte told him during his first interview of her the morning Stranger Horse was killed. (Trial T.[2] at 874-75.) Nathan Chasing Hawk, a cousin of both Sharp Butte and Boyles, testified that Sharp Butte has a reputation in the community of being dishonest in that she "tends to kind of make up stories since she was small." (Trial T. at 990.)

Agent McConaghy's first interview of Sharp Butte occurred within a few hours of Stranger Horse's death. Sharp Butte approached law enforcement to tell them she had seen what happened to Stranger Horse. The story she told McConaghy was full of details that were later admitted by Sharp Butte to be lies. She told McConaghy the following story. (Trial T. 874-77.) Shortly after 6 a.m. she got into an argument with her sister, Tanya, in Horse Creek and Sharp Butte started walking north on Highway 83 towards White River. Jason was still down in Horse Creek. When she was a little south of the state shop, Jason drove by her in his car. He went up to the approach of the state shop, came back, and then ran over Stranger Horse. He then stopped the car and told Sharp Butte to get in the car. She got in the passenger seat of the car, he drove her to Swift Bear and then dropped her off. During this interview, McConaghy observed that the top of Sharp Butte's thighs and upper forearms were very red and irritated. When he asked about the irritation, Sharp Butte said that she got that when she got in the car after Boyles ran over Stranger Horse. McConaghy found her story unusual and after talking with some other witnesses, he believed Sharp Butte was in the car when Stranger Horse was killed.

Later in the day, McConaghy confronted Sharp Butte about whether she was inside or outside of the car when Stranger Horse was hit. Sharp Butte's mother and sister were present during this second interview. Sharp Butte then admitted her first story was a lie and she was in the car when

---

[2]References to "Trial T." in this opinion are to the transcript of the second trial commenced on June 3, 1996.

Stranger Horse was hit. But she continued to place Boyles in the driver's seat and said she was in the passenger's seat. (Trial T. 876-80.)

### 1. Dawn Andrews and Tony Valandra as witnesses

Boyles' first claim of ineffective assistance of counsel is that trial counsel failed to find an exculpatory statement of Tony Valandra[3] in the prosecutor's open file. Valandra's statement, set forth in the margin, was given to White River Police Officer Joe Krogman. This claim of ineffective assistance of counsel encompasses more than failure to find a potential witness, however, because the failure to find Valandra's statement not only prevented trial counsel from investigating Valandra, it resulted in him not calling another witness, Dawn Andrews. Although trial counsel called Andrews to testify at the first trial, he did not call Andrews to testify at the second trial because he did not find any corroborating evidence that someone other than Boyles was driving the Boyles' car the evening Stranger Horse was killed. Boyles further contends trial counsel's failure to discover Valandra's statement was prejudicial because if counsel had found that statement, he would have realized there were likely other witnesses who saw Sharp Butte driving the Boyles' vehicle around the time of the death. Several such witnesses were later found by habeas counsel and they testified at either the state habeas hearing or at the evidentiary hearing held in this case.

---

[3]The report of Tony Valandra's statement, written by White River Police Officer Joe Krogman, provides:

> Tony Valandra - Said seen the car 3 or 4 times that nite. Earlier first time he seen it said Sheri Two Hawk and [illegible] some young girls were in the car with Jason. 2nd time around 4:00 AM car traveled through alley was standing on upper step car pulled through Jason hollered something they didn't hear for sure what, didn't pay attention. Asked who was in car and who was driving said windows were too dark. Next time he seen the car traveling South on 83 with some girl driving it. Then [illegible] heard a engine racing and it come in from the street North of apartments and traveled into the parking lot of the apartments, and took off South headed towards Main. This time Tony said it was smashed up windshield and hood rear window looked like it had been rolled. About 5 minutes later, it came through the alley headed north and ran over a horse shoe stake in the alley and turned East at the street. Next time it was at SCS office. Tony called John Boyles told him car was all smashed up. Kept saying Jason driving crazy. And him driving.

(Doc. 18, Ex. 2.)

8

At Boyles' first trial, Dawn Andrews was called to testify on behalf of Boyles and a transcript of her testimony is in the record. At the time of Stranger Horse's death, Andrews lived in White River. During the trial, Andrews testified she was awakened by a noise at 5:13 a.m. on the morning Stranger Horse was killed. She got out of bed around 5:20 a.m. After looking out the window, she saw Boyles' car speeding up and down the street at about 50 miles per hour. She saw the car do a "cookie," but she was not able to see who was driving Boyles' car at that time or see if anyone was in the passenger seat. She saw a person in the back seat with long, dark hair. After eating a bowl of cereal and going outside to feed the dogs, she observed the Boyles' car between 6:00 a.m. and 6:15 a.m. as it "fishtailed" around a corner and then hit a fence post about 100 feet in front of her. (Andrews T. at 16-17 and 61.) After hitting the fence post and backing the car up a few feet, Andrews saw Sharp Butte get out of the driver's side of the Boyles' car. Sharp Butte had a tall can of Budweiser beer in her hand and was saying to someone in the car "fuck you, fuck you" as she was getting out of the driver's side. Andrews then saw Boyles get out of the passenger side of the car and stumble toward Sharp Butte. In Andrews' opinion, Boyles was drunk. She also saw Tanya Sharp Butte get out of the car and Andrews believed Tanya was drunk also. Andrews looked behind herself at the dog and when she turned around to look toward the car again, she saw Sharp Butte hit the back window of the Boyles' car with a black, round object. The back window was shattered and broken out by Sharp Butte. Andrews went back into her house at this point and did not see who got into the driver's seat of the Boyles' car after this incident.

When being questioned about why she didn't tell law enforcement about the subject of her testimony, Andrews repeatedly testified she attempted to tell tribal Officer John Miller on November 10, 1995, at the Rosebud Police Department, but he interrupted her and told her it was "a done deal." (Andrews T. at 28, 30-31,81, 84–85, 88-89, 92.) When being asked why she didn't tell any law enforcement officer about the events she testified to in court, Andrews stated, "[b]ecause they already had their thoughts set. The investigation was over." (Andrews T. at 84.) She also testified that in November or December 1995, before Boyles' trial, she told Martha Lamay, Martha's mother, and Martha's sister about the incident she testified to at Boyles' trial.

9

Andrews' belief that law enforcement was not investigating Stranger Horse's death in November 1995 is consistent with Agent McConaghy's testimony that the scope of the investigation in this case was not expanded "beyond tunneling in on Jason Boyles as the only possible person that could have done this ghastly horrible act of intentionally running over a stranger walking down the highway?" (Trial T. at 911.)   McConaghy testified that  he never expanded the scope of the investigation to look into whether Sharp Butte was driving the Boyles' car when Stranger Horse was killed. (*Id.* at 910.) He further testified that the reason some people lie when questioned by the FBI is that "[o]ftentimes they either don't want to get involved or they think they can also get in trouble for being there, seeing it or participating." (*Id.* at 924.)

In addition to Agent McConaghy, Officer Krogman testified that he was not aware of anybody, in any of the five various law enforcement agencies that helped investigate Stranger Horse's death, that did any investigation to determine if Sharp Butte was driving the car, other than interview her. (Trial T. at 716.) Another officer, Fred Bennett, who is employed by Rosebud Sioux Tribe Law Enforcement Services, likewise testified that he did not personally and he was not aware of any other law enforcement agency that investigated whether someone other than Boyles was driving the car that struck Stranger Horse. (Trial T. at 737.)

The record does not reveal any motive for Andrews to lie on behalf of Boyles.  The victim in this case was Andrews' uncle and was Andrews' mother's favorite brother.  Moreover, Andrews knew both Boyles and Sharp Butte, but testified, "I don't care for either one of them." (Andrews T. at 38.) On direct examination and on cross-examination she stated she had not been in trouble with the law and had not been arrested or appeared in court.  On re-direct examination, however, she admitted that she had pled guilty to a state charge of disorderly conduct in 1993, which was a class two misdemeanor.

Andrews was not called at the second trial to testify about seeing Sharp Butte driving Boyles' car and the violent conduct of Sharp Butte she observed within thirty minutes of Stranger Horse's death.  At the habeas hearing before the state court, trial counsel testified he did not call Andrews

at the second trial because, "I didn't believe anybody in the courtroom believed a word she said. And that was why I consciously chose not to put her on the second [trial]. I thought she probably did as much damage as she possibly could have done good." (Habeas T.[4] at 161.) When asked if he would have called Andrews to testify at the second trial if there was another witness who also saw Sharp Butte driving around the same time period, trial counsel testified: "If I had another person saying that they saw Harvi Lynn driving that car 4:00, 5:00 in the morning, oh, yes, sir, absolutely. We didn't have one though." (Habeas T. at 161-62.)

After trial counsel admitted he would have called Andrews if he had another witness placing Sharp Butte in the driver's seat around the same time period, habeas counsel introduced the report of Officer Krogman's interview of Tony Valandra that was in the prosecutor's file. The prosecutor had an open file policy, which would have allowed trial counsel to view the entire prosecution file in this case. Valandra's statement, reported by Officer Krogman, was in the prosecutor's file, but trial counsel admitted he did not go to the prosecutor's office and look through his file at any time before Boyles' trials and he did not know about Valandra's statement. Thus, trial counsel was unaware of the existence of a witness that saw a girl driving Boyles' car on Highway 83 after 4:00 a.m. on the morning of Stranger Horse's death. Krogman did not report that Valandra identified Sharp Butte as the girl driving the car, but trial counsel stated he would definitely have contacted Valandra because that was the type of evidence he and his investigator were looking for before both of Boyles' trials.

The state court that denied Boyles' state habeas petition (hereinafter "the habeas court") did not make any specific finding of fact regarding trial counsel's error in not finding Valandra's statement in the prosecutor's file. Another error of trial counsel in this regard includes not even looking at the prosecutor's open file in a murder case. A final error in this regard is not having directed his investigator to look at the prosecutor's open file. The habeas court acknowledged the state argued "a trial attorney's decision about whether to present witnesses or examine witnesses falls

---

[4]References to "Habeas T." in this opinion are to the State habeas hearing held on October 3, 2002.

squarely within counsel's strategic and tactical discretion." (State habeas record at p. 272.) The habeas court further summarily found Boyles did not establish any prejudice on the record before the court. (*Id.*)

On appeal from the denial of habeas relief, the South Dakota Supreme Court recognized the habeas court did not make a specific finding regarding Boyles' claim concerning Valandra and Andrews. *Boyles*, 677 N.W.2d at 541[5]. The State admitted on appeal that trial counsel's performance was deficient for failure to find and investigate the police report containing Valandra's statement. *See id.* The appellate habeas court held that despite this deficient performance, Boyles did not establish prejudice as a result of the failure to investigate. *See id.*

As a justification for rejecting Boyles' failure to investigate claim, the appellate habeas court noted Boyles did not call Officer Krogman, Valandra or Andrews to testify at the habeas hearing and concluded it had "no way of knowing how they would have testified under oath and subject to cross-examination." *Id.* at 542. That conclusion is correct as to Officer Krogman and Valandra, but it is incorrect as to Andrews because she testified and was subjected to cross examination during Boyles' first trial and a transcript of her testimony was in the record before the habeas courts. Thus, the court did have Andrews' sworn testimony, which was subject to cross examination by the state. The court further concluded: "The police report standing alone is insufficient to establish that [Boyles] was prejudiced." *Id.* The court pointed out that Valandra saw "some girl" driving Boyles' car, but he did not specifically identify Sharp Butte as the driver. Thus, the court concluded Valandra's observations would "not [be] sufficient to corroborate Andrews' testimony that she saw Sharp Butte driving the car at approximately 4:00 a.m." *Id.*

Contrary to the appellate habeas court's statement, however, Andrews did not testify that she saw Sharp Butte driving Boyles' car at "approximately 4:00 a.m." *Id.* Rather, she testified it was between 6:00 a.m. and 6:15 a.m. that she saw Sharp Butte exit the driver's side of Boyles' car and

---

[5]References in this opinion to the appellate court that denied Boyles' habeas petition will be to the "appellate habeas court."

smash the back window with an object. (Andrews T. at 60-61.)   The habeas court found that Stranger Horse was killed between 6:00 a.m. and 6:30 a.m., during which time the only two occupants in the car were Boyles and Sharp Butte. (State Habeas record at 274.)  Thus, Andrews' testimony placed Sharp Butte in the driver's seat of Boyles car within the same thirty minutes that Stranger Horse was killed.  The appellate habeas court was correct in finding Valandra's statement is not precise about the time he saw "the car traveling South on 83 with some girl driving it." (State Habeas record at 219.)  That court was incorrect, however,  in stating that, "the statement indicates that the witness saw the car on several occasions, but does not identify which occasion he saw the female driving."  *Boyles*, 677 N.W.2d at 542.  Contrary to the court's statement of the facts, Valandra's statement clearly indicates it was on the *third* occasion that he saw the girl driving the car on Highway 83.  *See* note 3, *supra*.  The statement also clearly states the *second* time he saw the car was around 4:00 a.m., which means he saw a girl driving Boyles' car South on Highway 83 after 4:00 a.m.  The written record in this case demonstrates by clear and convincing evidence that the findings by the appellate habeas court identified above are incorrect.  In contrast to the appellate habeas court, the habeas trial court did not make any specific factual findings regarding Valandra's statement.

Another statement made by the appellate habeas court was that, "[g]iven father's direct involvement in bringing several potentially exculpatory witnesses to habeas counsel, it is difficult to imagine why [Valandra] was not brought to counsel's attention at the time of trial if he was able to place Sharp Butte in the driver's seat near the time of the homicide." *Boyles*, 677 N.W.2d at 542. Importantly, at the time of trial neither trial counsel nor Boyles' father was aware of the exculpatory nature of Valandra's statement to Officer Krogman. Rather, one of the likely reasons Boyles' father did not bring Valandra to anyone's attention was that Valandra told him *Jason* was driving the car and that *he* was driving crazy.  Valandra did not indicate to Officer Krogman that he told Boyles' father he had seen a girl driving the car earlier in the morning.  Thus, rather than being an *exculpatory* witness to bring to trial counsel's attention, Boyles' father likely believed Valandra would provide *inculpatory* evidence against his son, which would explain why he did not bring Valandra to trial counsel's attention.

In support of its conclusion that there was no prejudice for failing to find Valandra's statement, the appellate habeas court emphasized Valandra's statement referred to "Jason" driving and "him" driving. *Boyles*, 677 N.W.2d at 543. The emphasized portions of Valandra's statement, however, are not inconsistent with the exculpatory nature of the statement that the *third* time he saw the car a girl was driving it south on Highway 83. In proper context, the emphasized portions of Valandra's statement occurred on the *fourth or fifth* occasion Valandra saw the Boyles' car and after the windshield was damaged. The emphasized portions of Valandra's statement described the conversation he had with Boyles' father *after* seeing the car damaged, which was consistent with Boyles' hypnotically-recalled memory that after Sharp Butte hit Stranger Horse, Sharp Butte stopped the car and made Boyles drive into town. Moreover, these statements are not inconsistent with Andrews' testimony of seeing Sharp Butte exit the driver's side door of the Boyles' car *before* the front windshield was damaged.

Although trial counsel testified Andrews was "crucified" on the stand, the Court has reviewed her testimony and the appellate habeas court's decision that Boyles did not show she would have testified or that her testimony would have probably changed the outcome of the trial. The appellate habeas court made several erroneous factual findings regarding the undisputed written record in reaching its conclusion about the value of Andrews' testimony to the defense. The Court finds the appellate habeas court and trial counsel seriously underestimated Andrews' value as a witness for the defense at the second trial, especially given the lack of any other witness to place Sharp Butte in the driver's seat. This is one of the rare cases in which the habeas petitioner has overcome the strong presumption that the challenged action might be considered sound trial strategy. *See Strickland*, 466 U.S. at 689. First, Andrews testified at the first trial that resulted in a hung jury. Second, she was the victim's niece and the victim was one of her mother's favorite brothers. Third, her family was convinced Boyles was the driver and they did not want to hear Andrews' account of what she saw. Fourth, she did not have any motive to lie to help Boyles. Fifth, she testified she tried to tell law enforcement about what she saw, but was told it was a "done deal" and they had their suspect in custody. This testimony by Andrews is supported by Agent McConaghy's testimony that he did not expand the scope of the investigation to look into the possibility that someone other than

14

Boyles was driving the car that struck Stranger Horse.  Her testimony is also supported by the testimony of two other law enforcement officers, Officer Krogman and Fred Bennett, who did not personally investigate and were not aware of any other law enforcement officer who investigated the possibility of someone other than Boyles driving the car.

The Court recognizes Andrews testified on direct examination at the first trial that she had not had any trouble with the law and had not been arrested.  Then, on re-direct examination after a break in the trial, she testified she had pled guilty to a Class 2 misdemeanor[6] in 1993 for disturbing the peace and sat in the jailhouse for a couple of days.  She admitted the misdemeanor was for fighting.  The Class 2 misdemeanor would not have been admissible under South Dakota law because Andrews was not convicted of a crime punishable by imprisonment in excess of one year and it did not involve dishonesty or false statement.  *See* SDCL § 19-14-12 (allowing introduction of prior convictions of crimes punishable by death or imprisonment in excess of one year or for crimes involving dishonesty or false statement).  The Court recognizes, however, that although Andrews would likely not have denied being in trouble with the law or being arrested at the second trial, the prosecution could impeach her with her testimony from the first trial.  Despite this impeachment evidence, it is significant that Andrews' credibility would be compared by the jury to the State's primary witness, Sharp Butte, who had a solid reputation as a liar in the community, had a clear motive to lie in this case and who had admittedly falsely told law enforcement she was not even in the Boyles' car at the time Stranger Horse was killed.

The South Dakota Supreme Court on direct appeal concluded that, "Boyles' conviction rests heavily upon [Sharp Butte's] word."  *State v. Boyles*, 567 N.W.2d at 862.  Without Andrews' testimony, the only testimony placing Sharp Butte in the driver's seat of Boyles' car was Dr. Stricherz's recollection of what Boyles said in the hypnosis session.  The importance of testimony placing a girl in the driver's seat is further shown by the court's finding on direct appeal that, "only Boyles was seen behind the wheel that morning ...", which finding was relied on in the direct appeal

---

[6]Under South Dakota law, a Class 2 misdemeanor is punishable by a maximum of thirty days' imprisonment in a county jail or two hundred dollars fine, or both.  *See* SDCL § 22-6-2 (2004).

to deny Boyles' motion to examine the jurors, for judgment notwithstanding the verdict and for a new trial. *Id.* Thus, although Valandra's statement does not identify Sharp Butte, it does corroborate Andrew's testimony to the extent that she saw a girl driving the car after 4:00 a.m. the morning Stranger Horse was killed. Valandra's statement also corroborates Boyles' hypnotically-recalled memory to the extent that a girl, and not Boyles, was driving the car at least once after 4:00 a.m. the morning Stranger Horse was killed. Valandra's statement was exactly the kind of evidence trial counsel looked for to corroborate Andrews' testimony. Although trial counsel chose not to call Andrews without corroborating evidence, Valandra's statement would have provided the type of evidence he was looking for in making the decision whether to call her. Trial counsel's view of the credibility of Andrews' testimony was compromised by the failure to investigate the prosecutor's open file.

Boyles' trial counsel testified at the state habeas hearing that if he had found corroborating evidence, he would have called Andrews to testify. Andrews' sworn testimony is in the record and was examined in detail above. Evaluating the credibility of all witnesses, including the likely impeachment of Andrews, the interplay of Andrews with the actual defense witnesses called, and the evidence actually presented by the prosecution in this case, *see McCauley-Bey*, 97 F.3d at 1106, the Court finds the state appellate habeas court's finding that Boyles failed to show the outcome of the trial would have probably changed had trial counsel found Valandra's statement and called Andrews as a witness, was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. In contrast to the government's case in *McCauley-Bey*, 97 F.3d at 1106, which was overwhelming, the government's case against Boyles was far from overwhelming. Rather, as recognized by the South Dakota Supreme Court, "Boyles' conviction rests heavily upon [Sharp Butte's] word." *State v. Boyles*, 567 N.W.2d at 862. Thus, the government's case against Boyles hinged on the testimony of an admitted liar with a strong motive to place Boyles, rather than herself, in the driver's seat at the time Stranger Horse was struck and killed. As discussed below in connection with Boyles' claim for inadequate cross examination of Sharp Butte, trial counsel's decision not to call Andrews also precluded trial counsel from confronting Sharp Butte with Andrews' testimony that she was driving the Boyles' car at about 6

16

a.m. Based upon the above discussion, the Court finds that the South Dakota Supreme Court's decision that there was no prejudice for failure to investigate and find Valandra's statement and for failure to call Andrews as a witness, was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and Boyles' request for a new trial, based upon ineffective assistance of counsel, will be granted under 28 U.S.C. § 2254(d)(2).

Boyles has not established by clear and convincing evidence the incorrectness of the appellate habeas court's decision that failure to call Valandra as a witness did not result in prejudice. The state habeas court was unable to evaluate the credibility of Valandra. There is no evidence to show whether he could have been impeached. Moreover, there has been no explanation for failure of habeas counsel to secure Valandra's sworn testimony in the post-conviction proceedings. Accordingly, Boyles is not entitled to relief under 28 U.S.C. § 2254 for failure to call Valandra as a witness.

### 2. Witnesses called at state habeas hearing that saw Sharp Butte in driver's seat

Another aspect of Boyles' failure to investigate claim is that trial counsel's faulty investigation did not result in the discovery of several witnesses who either saw Sharp Butte driving the Boyles' vehicle near the time of Stranger Horse's death or who could impeach Sharp Butte. Trial counsel testified at the habeas hearing that he and an experienced investigator did a diligent search for witnesses to support Boyles' defense. The appellate habeas court clearly evaluated Boyles' ineffective assistance claim for failure to investigate as it related to Valandra, Andrews and Margaret Hopkins. *Boyles*, 677 N.W.2d at 541-43. The decision is not clear, however, that the court considered Boyles' claim that trial counsel was ineffective in failing to discover the following additional witnesses: Nola Brill, Kevin Youngman, Mia Youngman, Christine Bear Heels and Imadeen White Buffalo,[7] who Boyles claims were eyewitnesses to Sharp Butte driving the Boyles' car the morning Stranger Horse was killed.

---

[7]Boyles raised the issue of ineffective assistance of counsel based on failure to investigate and discover Brill, the Youngmans and White Buffalo, in his brief to the state appellate habeas court. *See* Doc. 7, Attachment 8 at p. 18-21.

A reference to ineffective assistance of counsel is included in Section 1 of the appellate habeas court's decision addressing Boyles' claim that the habeas court erred in denying a motion for new trial based upon newly discovered witnesses. *Boyles*, 677 N.W.2d at 537. In Section 1 of the opinion, the court summarized the testimony of Brill, the Youngmans, Bear Heels and several other witnesses who testified at the habeas hearing. This did not include White Buffalo, however, as she did not testify at the habeas hearing. The court held that, "Petitioner's claim that he should be entitled to a new trial based on this newly discovered evidence is therefore not within the jurisdiction of this Court or the circuit court in a habeas action unless it directly establishes a deprivation of constitutional rights, such as ineffective assistance of counsel." *Boyles*, 677 N.W.2d at 537. The appellate habeas court summarily concluded at the end of Section 1 of its opinion that the "evidence fails to establish a deprivation of constitutional rights." *Boyles*, 677 N.W.2d at 540. Based upon the court's reference to deprivation of constitutional rights and ineffective assistance of counsel, the Court will assume the appellate habeas court considered the failure to investigate claim as to Brill, the Youngmans and Bear Heels.

The appellate habeas court examined Brill's, the Youngmans' and Bear Heels' testimony in more written detail than the habeas court. The habeas court heard the testimony of these four witnesses and made summary written findings and conclusions about their testimony and all other witnesses at the habeas hearing. The appellate habeas court summarized the testimony of the Youngmans, Brill and Bear Heels in Section 1 of its opinion. *See Boyles*, 677 N.W.2d at 536-40. As stated above, White Buffalo did not testify at the habeas hearing. Brill testified she saw Sharp Butte driving the Boyles' car at about 6:00 a.m. on the morning Stranger Horse was killed. Kevin Youngman testified he saw Sharp Butte driving the Boyles' car at dawn the morning Stranger Horse was killed. Mia Youngman testified when it was getting light out that morning she saw Sharp Butte driving the Boyles' car when the windshield was still intact. Bear Heels testified she saw Sharp Butte driving the Boyles' car while it was still dark on the morning Stranger Horse was killed.

In addition to the witnesses placing Sharp Butte in the driver's seat, Boyles called Hopkins to testify at the habeas hearing that before Boyles' trials, she overheard Sharp Butte crying and

telling her sister, Tanya, that she "couldn't handle it anymore" and that she said she was the one driving the car and she said "I hit that man and I just left." (Habeas T. at 40.) Hopkins did not tell any law enforcement authority about what she heard because she was scared and "didn't know what to do." (Habeas T. at 42.) After Boyles' father approached her in 1998, Hopkins informed Boyles' habeas counsel of this evidence and agreed to testify at the habeas hearing.

Neither the habeas court nor the appellate habeas court made a specific finding about whether trial counsel's performance was deficient for failure to find the Youngmans, Brill or Bear Heels. As to Hopkins, the appellate habeas court found counsel's performance was not deficient because "in order for defense counsel to have known about Hopkins' testimony he would need to be clairvoyant; a requirement we do not impose on trial counsel." *Boyles*, 677 N.W.2d at 543. The Court doubts about the effectiveness of a portion of trial counsel's investigation given his failure to find Valandra's statement in the prosecutor's open file, let alone even look at the file, and the number of witnesses habeas counsel discovered during the post-trial investigation who saw Sharp Butte driving Boyles' car within the hour Stranger Horse was killed. The Court recognizes, however, based upon FBI Agent McConaghy's testimony, that people do not want to get involved in criminal investigations and trial defense counsel may not have been able to find these witnesses for that reason. Given the deferential standard for reviewing state habeas court decisions in a § 2254 proceeding, the Court does not find the appellate habeas court's decision failing to find deficient performance by trial counsel regarding his investigation is contrary to, or an unreasonable application of, clearly established Federal law or that it was based on an unreasonable determination of the facts presented in the state habeas proceedings.

As to the prejudice prong of the ineffective assistance of counsel claim, the appellate habeas court upheld the habeas court's conclusion that the evidence presented at the state habeas hearing would not have changed the outcome of the trial because none of the witnesses were credible. The habeas court found that, "many of the Petitioner's witnesses or their close friends/relatives had been prosecuted by the prosecutor that prosecuted the Petitioner and certainly held a personal dislike for the prosecutor and this affected their credibility regarding this matter. Also some of these witnesses

19

testified they knew about the case at the time (five or six years before) 'but just didn't want to get involved.'" (State Habeas record at 273.) The habeas court further concluded that, "the testimony of witnesses who have been located or have come forward since Petitioner's 1996 conviction, revealed for the first time nearly five or six years after Petitioner's conviction, lacks credibility and would not have changed the outcome of the trial." (State Habeas record at 272.) Addressing the credibility of Boyles' witnesses, the appellate habeas court refused to "substitute [its] judgment for that of the judge who saw the demeanor and heard the testimony of the witnesses." *Boyles*, 677 N.W.2d at 540.

The Court disagrees with the habeas court's decision that the testimony of Boyles' witnesses who saw Sharp Butte driving within the hour of Stranger Horse's death and who heard her admit to killing Stranger Horse would not have changed the outcome of the trial. As recognized by the court on direct appeal, the evidence presented at the second trial showed that "only Boyles was seen behind the wheel that morning." *Boyles*, 567 N.W.2d at 862. Boyles' witnesses' credibility must be compared primarily to Sharp Butte. Sharp Butte's poor credibility was examined in detail above. Moreover, the testimony of Sherry and Nellie Two Hawk, Antonio Fallis and Mike Moran is not inconsistent with Boyles' witnesses testimony. All of these witnesses saw the car at different times the morning of Stranger Horse's death. Gloria Moran's testimony that she saw Sharp Butte get out of the passenger side of the car in Swift Bear was consistent with Boyles' hypnotically-recalled memory that after Sharp Butte ran over Stranger Horse, she made him drive back to town. Despite the Court's disagreement with the appellate habeas court's findings regarding the effect of these witnesses' testimony on the outcome of Boyles' trial, without a finding of deficient performance in failing to find these witnesses, relief cannot be granted on this aspect of Boyles' ineffective assistance of counsel claim.

## B. Failure to appeal exclusion of Boyles' video-taped hypnotic memory recall session

Boyles has no conscious memory of Stranger Horse's death. The state trial court appointed a hypnotist, Dr. Mathias Stricherz, to conduct a video-recorded hypnotic memory recall session. During a pretrial motions hearing on February 20, 1996, for the first trial, the trial court ruled that

20

neither the videotape of the hypnosis session nor the transcript of that session would be shown or given to the jury. (Pretrial Motions Hearing T. at 8, 10.) During the first trial, however, the trial court found that the prosecution had opened the door through questioning and allowed Boyles to show the videotape of the hypnosis session to the jury. The first trial resulted in a hung jury.

On the first day of the second trial during a motions hearing, the trial court again ruled that the videotape could not be shown to the jury. (Trial T. at 11.) The videotape was not shown to the jury during the second trial. Dr. Stricherz was allowed, however, to testify about statements Boyles made during the hypnosis session. The exclusion of the videotape was not raised on direct appeal. *Boyles*, 567 N.W.2d at 858. In his state habeas, Boyles claimed his counsel was ineffective on appeal for failing to appeal the exclusion of the videotape. *See Boyles* 677 N.W.2d at 543-45. The appellate habeas court found Boyles had failed to show the trial court abused its discretion in limiting admission of the session to Dr. Stricherz's testimony. *See id.* at 545. The court concluded there was no indication the result of the direct appeal would have been different, and, thus the court held Boyles did not establish prejudice from appellate counsel's failure to raise the exclusion of the videotape on direct appeal.

In evaluating the trustworthiness of the hearsay statements in the videotape, the appellate habeas court noted that "there was no credible corroborating evidence." The Court notes that at the time the trial court made its ruling excluding the videotape, the testimony of the newly discovered witnesses who testified at the state habeas hearing and at the evidentiary hearing in this action was not available.

The videotape of Boyles' hypnosis session is hearsay. The videotape consists of out of court statements that were offered for the truth of the matters stated. "In general a videotape offered to prove the truth of the matter asserted constitutes inadmissible hearsay." *Spryncynatyk v. General Motors Corp.*, 771 F.2d 1112, 1117 (8th Cir. 1985). "In particular, courts have held that the contents of actual hypnotic interviews are inadmissible for the purpose of proving that the facts recounted by the hypnotized witness actually occurred." *Id.* (citations omitted). "Thus, a videotape is

21

inadmissible as evidence unless it comes within an exception to the hearsay rule," or is offered for another permissible purpose. *Id.*

The trial court found the statements during the hypnosis session were admissible, but those statements could only be admitted through the testimony of Dr. Stricherz. (Motions Hearing T. at 1-8, Feb. 20, 1996; Trial T. at 11.) The trial court found playing the videotape on the television was more prejudicial than probative and also giving the jury a transcript of the session may result in the jury placing more emphasis or credence on the written transcript than the other witnesses in the case. The appellate habeas court found Boyles would not have prevailed on direct appeal in challenging the trial court's decision. Thus, the court concluded, failure to raise the issue on direct appeal did not result in prejudice, which is required to establish ineffective assistance of appellate counsel.

The Court does not find this decision by the appellate habeas court is contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court. Further, the Court does not find the appellate habeas court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state habeas proceeding. Accordingly, relief will not be granted on Boyles' ineffective assistance of appellate counsel claim for failure to appeal exclusion of his video-taped hypnotic memory recall session.

## C. Failure to properly cross-examine glass fracturing expert

There are two aspects to this claim. The first is that trial counsel's hypothetical posed to the State's glass fracturing expert was deficient, which prejudiced Boyles. The second aspect of this claim is that trial counsel failed to adequately confront the State's expert with findings in his report that were consistent with Boyles being the passenger rather than the driver when Stranger Horse was struck by the car.

During the trial, Boyles introduced evidence from David Steffen that Boyles had a puncture or cut on his arm. Steffen worked at the ASCS building in White River and on the morning of August 10, 1995, he parked outside the ASCS building close to 7 a.m. Boyles' car was already

22

parked by the building and Boyles was standing outside the car when Steffen drove up to the building. Steffen testified he saw on Boyles' forearm "a puncture, a jagged, I'm going to say a three-sided L-shaped cut, if you will. Not a big one. Less than an inch or half, inch, something like that." (Trial T. at 930.) When asked which arm he saw this cut on, Steffen said "I believe it was his left forearm." (Trial T. at 929.) But then on cross examination Steffen was asked "Now, do you know for sure it was his left arm?" and he answered "No, I don't. I can't say that." (Trial T. at 937.) On redirect, Boyles' counsel asked Steffen: "Now, [the prosecutor] asked you if you're absolutely positive the cut you saw was on the right arm. You're best recollection, based upon remembering where everybody was standing, which arm do you believe the cut was on?" (Trial T. at 944.) Steffen's response was, "I'd have to say it was the left arm." (Trial T. at 944.)

Steffen did not see glass on or around Boyles. (Trial T. at 931.) Boyles testified he had glass in his hair. He said he noticed it when he woke up in jail and that it "was kind of small, but it was big enough so I could roll it underneath my fingers, my fingertips." (Jason Boyles T. at 8.) No one else testified they observed glass on Boyles.

Gloria Moran saw Sharp Butte shortly after the collision with Stranger Horse. Moran testified she saw glass on Sharp Butte but only after Sharp Butte pointed it out and then Moran could see "the shine." (Gloria Moran and Mike Moran T. at 27.) Moran saw real fine glass on Sharp Butte's forehead and on her legs. Sharp Butte was attempting to brush off the glass from her body when Moran noticed it. Moran didn't see any blood or bleeding cuts on Sharp Butte. Sharp Butte told Moran she had glass in her mouth and Sharp Butte rinsed her mouth out.

The State called Ron Rawalt, a Special Agent with the FBI, to testify as a glass fracturing expert. The following hypothetical situation was presented to Rawalt by the prosecutor: "in this case, there has been testimony that one of the people in the car had glass in the hair, on the forehead, here on the arms, and this particular person was wearing shorts, kind of prickly marks down there. And there has been testimony that the other passenger – the other person in the car, whether there was or not, but there has been no testimony to show that there was any glass on that particular

23

person, and there was also glass in this other person's mouth to the point they were – that person rinsed the mouth out to get the glass out of it." (Trial T. at 771.) Rawalt was then asked to give his opinion about which one of the two people described in the hypothetical would have been sitting in the passenger seat. Rawalt opined: "There would be no question the individual with the large volume of glass on them would be the individual that was closest to the fracture, and would be the person sitting in the – by virtue of the geometry and the inside of that, and the impacts, that would be the person sitting in the passenger seat." (Trial T. at 773.)

Rawalt testified the glass on the left-hand side of the driver's seat was not deposited there during the impact, but was later deposited there. He further said "with the downward force there is going to be a certain quantity of glass deposited, especially on the right leg, the right side of the driver. When the individual gets out of the vehicle and rolls to get out, that glass, when you swing your leg out, you're going to expose this side as you get out." (Trial T. at 774.) Thus, the glass on the left side of the driver's seat was "dumped there" as the driver exited the vehicle. He further opined that, "I do not believe that the driver would have any significant amounts of glass on them to the left chest area, the left arm, or the left leg." (Trial T. at 797.) In Rawalt's opinion, the driver would not have had any significant glass on the left leg because he did not believe there was any glass in the pocket of the driver's side door.

The day before Rawalt testified in June 1996, he took photographs of the Boyles' car. Exhibit 24 was one of the photographs taken by Rawalt. He stated the pocket in the driver's side door was dark because there was no glass in it. He admitted, however, he would expect to find microscopic particles of glass in the pocket on the driver's side door if he were to vacuum it.[8] (Trial T. at 813-14.)

---

[8] The Court notes a different picture introduced into evidence as Exhibit Y shows a closer and better-lit version of the pocket on the driver's door, and there is what appears to be particles of glass visible in the pocket as shown in Exhibit Y.

Rawalt testified the type of fracture pattern in the Boyles' windshield "ensures that anybody in this vehicle is going to be covered with glass. They're going to have glass all over them. It's going to be microscopic." (Trial T. at 787.) He further testified the closer one was to the impact zone, the larger the pieces of glass would be and the farther away from the impact zone the smaller the pieces of glass would be. But after awhile, one would have to be looking for the glass to see it: "[a]fter you have been up moving around for awhile, walking here, walking there, shaking your clothes and stuff like that, you would have to look to see that glass." (Trial T. at 805.)

### 1. Hypothetical posed by trial counsel

Boyles contends the hypothetical question posed by trial counsel to Rawalt was deficient because it was different from what Boyles described while under hypnosis. Under hypnosis, Boyles recalled his left arm was on the console between the seats when Stranger Horse was hit. Rawalt was not informed before he reached his conclusions that Boyles had a cut on his arm from the glass that bled. (Trial T. at 782.) The hypothetical posed to Rawalt by trial counsel was: "For example, if you had an individual sitting in the passenger seat over here, and that whole piece of glass gets kicked in, and that person put his hands up or something, he could sure get caught that way, couldn't he?" (Trial T. at 808.) Rawalt answered: "The possibility exists, yes." (*Id.*) Trial counsel also asked: "A person was sitting in that passenger seat when this collision occurred, and put their hands up or something, you could expect that they could get that type of glass impact or something that would actually cause the blood to come out?" (Trial T. at 809.) Rawalt answered: "That could happen, yes." (*Id.*)

The appellate habeas court found that, "[t]aken in context, the hypothetical was posed for the purpose of placing Boyles in the passenger seat." In the questions after the alleged deficient hypothetical questions, trial counsel attempted to "get the expert to agree that the person in the passenger seat would be more likely to have bleeding cuts." *Boyles*, 677 N.W.2d at 546. The court denied relief on this aspect of Boyles' ineffective assistance of counsel claim, concluding that trial counsel's hypothetical questions fell "within the realm of trial tactics to which we give great deference." *Boyles*, 677 N.W.2d at 545-46.

The Court agrees with Boyles' argument that the hypothetical posed to Rawalt was inconsistent with Boyles' memory under hypnosis of bracing himself with his left arm on the console and the right hand on the door when Sharp Butte hit the man. Although it may have been better to ask the hypothetical with Boyles' arm being on the console, it is likely, based on Rawalt's answer to the question actually posed, that the most Rawalt would have conceded is it would be possible for Boyles to have a bleeding cut if he was the passenger. That answer would not benefit Boyles enough to affect the outcome of the trial. Thus, the Court does not find grounds to disturb the appellate habeas court's finding of a lack of prejudice on this claim. But this lack of prejudice does not follow to the separate argument of Boyles, considered in the next section, that counsel was deficient for failing to confront Rawalt on the finding in his report that the driver would not have been injured on the left side of the body. As to the hypothetical question about Boyles' arm being on the console rather than in the air, the Court does not find the appellate habeas court's decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court or that it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Thus, relief will be denied on this ground.

## 2. Failure to confront expert with favorable findings in report

The second aspect of this ineffective assistance of counsel claim is that had trial counsel properly confronted the State's glass fracturing expert with the findings in his report, there is a reasonable probability the verdict would have been different, undermining any confidence in the verdict.

The first finding in Rawalt's report that Boyles contends trial counsel failed to confront Rawalt with was: "Any person sitting in this front passenger seat would literally be covered with glass from head down to the knee area. The glass would be of sufficient quantity and velocity to insure that the occupant of the seat would show physical indications of this glass deposition. These would include numerous cuts and scratches ranging in size from minute to severe, depending upon the activity of the occupant. .... The driver of the vehicle would not be expected to suffer any type

26

of abrasions on the left hand side of the body or in the leg region." (Rawalt's Report, Ex. 16 to Petitioner's Brief on the Merits, Doc. 18.)

Boyles contends trial counsel was deficient in failing to confront Rawalt with Steffen's observation of a "glass cut" on Petitioner's "left forearm," which, if true, would prove from Rawalt's own findings that Boyles was not the driver. Trial counsel did not pose a hypothetical question to Rawalt that if the puncture or cut testified to by Steffen was on Boyles' left arm, as was Steffen's best recollection, Boyles could not have been the driver based upon Rawalt's finding in his report that the driver "would not be expected to suffer any type of abrasions on the left hand side of the body ...".

Although not specifically asked by trial counsel, Rawalt testified, "I do not believe that the driver would have any significant amounts of glass on them to the left chest area, the left arm, or the left leg." (Trial T. at 797.) This is not specific testimony about *injury* to the left side of the driver's body, however, and the appellate habeas court found "it is clear that trial counsel did not specifically confront the expert with the statement that the driver would not be expected to have cuts on the left side of his or her body." *Boyles*, 677 N.W.2d at 546. In finding this failure did not amount to ineffective assistance of counsel, the appellate habeas court held:

> The expert was thoroughly cross-examined with the clear objective of placing Sharp Butte in the driver's seat. To that end, counsel persistently attempted to get the expert to agree that the driver could have very small glass cuts on her thighs. The purpose was to tie that testimony to the fact that witnesses described Sharp Butte as having something that looked like prickly heat, but could have been a rash caused by small particles of glass, on her thighs. This was an issue of trial strategy. Furthermore, Petitioner fails to show prejudice. The expert's report was admitted into evidence, and trial counsel took full advantage of his closing argument to point out the fact that the left arm injury was inconsistent with Boyles being the driver.

*Boyles*, 677 N.W.2d at 546. Whether trial counsel cross examined the expert about glass cuts to Sharp Butte's thighs, however, does not resolve the question of whether trial counsel's failure to ask the expert about the left arm injury to Boyles amounted to deficient performance. Trial counsel was not successful in eliciting testimony from Rawalt that the rash on Sharp Butte's thighs was consistent

27

with her being in the driver's seat. Thus, this cross examination did not yield any beneficial concession from the expert that would have been consistent with Boyles being in the passenger seat.

The appellate habeas court's rationale is that since trial counsel asked the expert other questions to try to place Sharp Butte rather than Boyles in the driver's seat, his failure to ask about the inconsistency of a glass cut to Boyles' left forearm with the report, is not deficient performance. That court concluded it was a matter of trial strategy to ask about glass cuts to Sharp Butte's thighs rather than asking about the glass cut to Boyles' arm. The Court finds this conclusion was based on an unreasonable determination of the facts in light of the facts presented at the state habeas hearing. Trial counsel testified at the habeas hearing that he should have confronted the expert about the findings in his written report about the driver not having any injuries to the left side of the body. (Habeas Hearing T. at 147-49). Boyles has overcome the strong presumption that the failure to ask these questions might be considered sound trial strategy. Based on Rawalt's testimony and his written findings, it would not have been credible for Rawalt to claim that a left forearm injury to Boyles is consistent with him being the driver. Thus, the record establishes deficient performance by trial counsel.

The next prong of an ineffective assistance of counsel claim is prejudice. As quoted above, the appellate habeas court found there was no prejudice in failing to confront the expert with the findings in his report because "[t]he expert's report was admitted into evidence." *Boyles*, 677 N.W.2d at 546. This is a clear error on the part of the appellate habeas court, however, because Rawalt's written report was never offered or admitted into evidence at Boyles' trial. If the expert report had ben admitted into evidence, this Court would agree with the appellate habeas court on this point.

Failure to confront Rawalt with his finding that the driver would not have suffered any abrasions to the left side of the body deprived Boyles of the opportunity to establish from Rawalt's own report a left-arm injury would not be consistent with Boyles being the driver. Although Steffen was not absolutely positive the cut was on Boyles' left forearm, that was his best recollection.

28

Steffen had no motive to lie on behalf of Boyles and he was clearly in a position to see the left side of Boyles' body. The evidence in this case was far from overwhelming that Boyles was the driver and if trial counsel had properly confronted the expert with the finding in his report that the driver would not be expected to have any abrasions on the left side of the body, there is a reasonable probability the verdict would have been different, undermining any confidence in the verdict.

The appellate habeas court also found Boyles did not suffer prejudice for failure to confront Rawalt with his written findings because trial counsel made this argument during closing arguments. Argument of counsel, however, is not *evidence*. Moreover, without the expert's report in evidence and no questions from trial counsel asking about Rawalt's written findings, trial counsel could not point out the inconsistency of a left-arm injury with the clear written finding of the expert that the driver would not be expected to have any abrasions to the left side of the body.

Based upon the above discussion, the Court finds the appellate habeas court's holding that Boyles' trial counsel did not render ineffective assistance of counsel for failing to confront the glass fracturing expert with the written finding in his report that the driver would not be expected to suffer any abrasions to the left side of the body was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2). Therefore, habeas relief will be granted on this ground.

Boyles also contends trial counsel failed to confront Rawalt with the fact that Sharp Butte had no glass cuts, which is inconsistent with her being the passenger based upon Rawalt's finding that the passenger would have "numerous cuts and scratches ranging in size from minute to severe." Trial counsel did, however, ask Rawalt the following questions about the lack of significant injury to Sharp Butte:

> Q.   You would expect to see somebody who had legs exposed on the passenger side of that door [sic] with this type of a collision to have something more than pinpricks, wouldn't you.

29

A.     It would depend on their activity.  How much they tried to cleanse themself. How scared they were.  How much they punched on the glass.  That would dictate the exact amount of damage that the person would do.

Q.     You would expect that they would also have some pretty good scratches just from the velocity from the glass hitting their legs, wouldn't you?

A.     No.

Q.     Talking bare legs?

A.     No, not in the laminated glass. ....

(Trial T. at 803-04.)  Thus, trial counsel did cross examine Rawalt about the lack of glass cuts on Sharp Butte.  The appellate habeas court found: "It may have had more impact to confront [Rawalt] with his own words, but we decline to second-guess decisions made in the heat of cross-examination." *Boyles*, 677 N.W.2d at 547.  The court does not find this decision is contrary to or an unreasonable application of federal law or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Therefore habeas relief will not be granted on this claim of ineffective assistance of counsel.

### D. Failure to adequately cross examine Sharp Butte

Boyles contends trial counsel rendered ineffective assistance of counsel because he did not confront Sharp Butte with various prior inconsistent statements regarding the hours prior to Stranger Horse's death.  Trial counsel testified at the state habeas hearing that he "thought we had a pretty good cross-examination of Harvi Lynn Sharp Butte.  I'm sure there's things I missed ...." (Habeas T. at 125.)

First, Boyles contends Sharp Butte should have been confronted with her first story to Agent McConaghy, which included several details of how she was walking down the road when she saw Boyles run over Stranger Horse and how Boyles stopped the car, said "Did you see that?" and then forced her to get inside the car.  The appellate habeas court found that, "[o]ur review of the record reveals that trial counsel questioned Sharp Butte extensively regarding her previous statement to the FBI that she was not in the car when Boyles ran over the victim." *Boyles*, 677 N.W.2d at 548.  The

30

Court agrees with Boyles that it may have been beneficial to cross examine Sharp Butte about the false details she admittedly told the FBI Agent to show she is capable of fabricating details in her story, such as the "watch this" statement she agreed Boyles made just before Stranger Horse was hit. (Sharp Butte T. at 41-42.)  But considering the cross examination as a whole and the standard of review under 28 U.S.C. § 2254(d), the Court does not find Boyles is entitled to habeas relief for this failure.

Second, Boyles asserts Sharp Butte should have been confronted about her testimony that after Stranger Horse was struck, he "[j]ust smiled or whatever." She had not told anyone before the second trial that Boyles "smiled" after Stranger Horse was struck by the car. She had testified to the grand jury, at the preliminary hearing, at the first trial and had been interviewed several times by law enforcement and she had not mentioned this detail.  Trial counsel admitted he should have cross examined Sharp Butte about this statement. (Habeas T. 134.) The appellate habeas court found that, "[v]iewing counsel's cross-examination as a whole, counsel made a concerted effort to undermine Sharp Butte's credibility.  In large measure, it appears that the case hinged on whether the jury believed Sharp Butte's testimony concerning who was driving that evening." *Boyles*, 677 N.W.2d at 548. The court rejected Boyles' claim of ineffective assistance of counsel on this ground because "[w]hile impeaching her regarding this statement may have been a valuable aid in undermining her credibility, counsel's cross-examination was competent" and did not rise to the level of deficient performance. *Boyles*, 677 N.W.2d at 548. Although this is a close question of ineffective assistance of counsel given the pivotal nature of Sharp Butte's credibility, the Court does not find that the appellate habeas court's decision was contrary to or an unreasonable application of *Strickland*, 466 U.S. at 687 (providing that to show deficient performance of trial counsel, one must show counsel's errors were "so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment.").

Third, Boyles argues that failure to confront Sharp Butte's denial of ever driving the Boyles' car the morning Stranger Horse was killed with Andrews' testimony, that she saw Sharp Butte driving Boyles' car between 6:00 and 6:15 a.m., and Valandra's statement, that he saw some girl

driving Boyles' car after 4:00 a.m. that morning, amounted to ineffective assistance of counsel. The appellate habeas court rejected this ineffective assistance of counsel claim, finding that, "failure to call Andrews was a matter of trial strategy and failure to call Valandra was not shown to be prejudicial." *Boyles*, 677 N.W.2d at 549. The Court agrees that failure to cross examine Sharp Butte about Andrews' testimony is not ineffective assistance of counsel, but for a different reason than that advanced by the appellate habeas court. Andrews was not called as a witness at Boyles' second trial, so he could not logically confront Sharp Butte with Andrews' testimony. If he had done so, or attempted to do so, the jury likely would have questioned why Boyles did not call Andrews as a witness at the second trial. Thus, it was not deficient performance to fail to confront Sharp Butte with testimony of a witness he would not be calling. But, as set forth above, the Court finds it was ineffective assistance of counsel not to call Andrews at the second trial, and the inability to confront Sharp Butte with Andrews' testimony is an additional reason supporting the Court's finding above that it was both deficient performance by trial counsel not to call Andrews and that Boyles was prejudiced thereby.

The Court further finds Boyles has not established failure to confront Sharp Butte with Valandra's statement amounted to deficient performance or prejudice. Again, anything that would have helped discredit Sharp Butte could have helped Boyles' case, but having evaluated trial counsel's cross examination of Sharp Butte as a whole, the Court does not find the appellate habeas court's denial of Boyles' ineffective assistance of counsel claim was contrary to or an unreasonable application of *Strickland*, 466 U.S. at 687, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

## E. Failure to object to and appeal vouching of Sharp Butte by Agent McConaghy

The next claim of ineffective assistance of counsel advanced by Boyles is that trial counsel erred in failing to object to and appeal Agent McConaghy's alleged improper vouching or bolstering of Sharp Butte's testimony that Boyles was driving when Stranger Horse was killed. Agent McConaghy was the FBI agent assigned to investigate Stranger Horse's death.

Agent McConaghy testified about the lies Sharp Butte told him during his first interview with her, which was that she was walking along the road when Boyles ran over Stranger Horse and then Boyles made her get in the car. The prosecutor then asked "did you have any reason at any time to disbelieve her story that she just told you?" (Trial T. at 876.) Agent McConaghy answered in part, "I thought it unusual." (*Id.*) Based upon the irritated skin he observed on Sharp Butte and after talking with other witnesses, Agent McConaghy said he "was getting the idea at that point that that probably was not what had occurred." (Trial T. at 877.) He then took Sharp Butte's sister and mother with him to confront her in a second interview about whether she was inside or outside the car when Stranger Horse was hit.

While testifying about the second interview with Sharp Butte, and over trial counsel's objection, Agent McConaghy was allowed to opine that he did not have any reason to "disbelieve" Sharp Butte was in the passenger seat as she had told him during the second interview. (Trial T. at 880.) He also testified Sharp Butte's second version of the incident was "more consistent" with "what **I believed** at that point as to what had happened during the accident." (Trial T. at 879 (emphasis added).) The exchange between the prosecutor and Agent McConaghy is set forth in the margin.[9]

---

[9] The prosecutor, Mr. Strain, asked the following questions and Agent McConaghy gave the following answers:

Q.    The second interview that you had with her, did that interview's version change from her first one?
A.    Yes. It was more consistent the second one –
      MR. WHITING: I'm going to object, your Honor. He's drawing conclusions which the jury's going to determine which, if any, interview's version was changed.
      THE COURT: The objection is overruled. You may continue your – finish your answer.
A.    The second version was more consistent with the physical evidence, and what I believed at that point as to what had happened during the accident.
Q.    (By Mr. Strain) And in the second version, did she place herself in the car when Ronald Stranger horse was struck by that vehicle?
A.    Yes, she did.
Q.    Did she place herself in the passenger seat or the driver's seat?

The prosecutor asked when Agent McConaghy first heard a suggestion that someone other than Boyles was driving. Agent McConaghy testified it was after Boyles was hypnotized. The prosecutor then asked if Agent McConaghy reevaluated the issue of who was driving after Boyles was hypnotized and the agent said he did think about whether he had "covered everything." (Trial T. at 889.) The prosecutor then asked if Agent McConaghy was satisfied with his investigation or if he did some additional investigation. Agent McConaghy answered: "I was satisfied with the conclusions that I come to," which was that Boyles was the driver and Sharp Butte was the passenger. (*Id.*)

---

A.     In the passenger seat.
Q.     All right. Did you, at that point or any other time at that point, did you have any reason to disbelieve she was in the car, number one?
A.     No, I did not.
Q.     Did you have any reason to disbelieve she was in the passenger seat?
       MR. WHITING: Your Honor, that's the question I'm objecting to because that's what this trial is about, and this is asking for a conclusion based on the interview of somebody that's admitted lying over and over. It's just an improper question.
       MR. STRAIN: Your Honor, he is just – he is trying to reiterate something. He's got an objection – I'll certainly abide by the court's ruling there. But what's his objection?
       MR WHITING: It's asking for a conclusion of this witness that he's not able to make a conclusion.
       THE COURT: That objection is overruled. You want to read the question back now, please. (Whereupon, the last question was read back.)
       MR WHITING: That's what I object to, Your Honor.
       THE COURT: I understand that. It's overruled. You may answer the question.
A.     No, I did not.
Q.     (By Mr. Strain) Okay. Was there any indication during your investigation that led you – that would have led you to believe that someone else may have been driving that car besides Jason Boyles?
       MR. WHITING: Same objection, your Honor.
       THE COURT: Overruled
A.     No.

(Trial T. at 879-81.)

The appellate habeas court concluded Agent McConaghy did not bolster or vouch for Sharp Butte:

> Taken in context, the testimony of the Agent did not bolster or vouch for Sharp Butte's testimony. He was merely testifying to the conclusions he had drawn based on his interviews of Sharp Butte and his investigation of the homicide. He was not being asked whether Sharp Butte's testimony was truthful, but rather which of the stories she told him was more consistent with the physical evidence. Agent McConaghy was not being asked whether Defendant was guilty, but whether, based on his opinion, the physical evidence was consistent with her statement. This did not invade the province of the jury.

*Boyles*, 677 N.W.2d at 549.

In evaluating the appellate habeas court's decision, it must be remembered that the *ultimate* issue the jury had to decide was whether Boyles or Sharp Butte was driving the car when Stranger Horse was killed. Thus, in order to convict Boyles, the State had to prove beyond a reasonable doubt that Boyles was in the driver's seat when Stranger Horse was killed. Contrary to the appellate habeas court's decision, Agent McConaghy was *not* being asked which of the stories Sharp Butte told him was more consistent with the physical evidence. Before he testified, Sharp Butte had already admitted the first story she told Agent McConaghy was a lie. Thus, it was established the first story Sharp Butte told was a lie and Agent McConaghy stated her second story was "more consistent with the physical evidence, and what **I believed** at that point as to **what had happened** during the accident." (Trial T. at 879.) Asking Agent McConaghy whether he had "any reason to disbelieve" Sharp Butte's statement that she was in the passenger seat is essentially the same as asking whether he "believed" she was sitting in the passenger seat.

Contrary to the appellate habeas court's conclusion that Agent McConaghy was not being asked whether Boyles was guilty, he was asked: "Was there any indication during your investigation that led you – that would have **led you to believe** that someone else may have been driving that car besides Jason Boyles?" (Trial T. at 881.) Establishing Boyles was the driver rather than Sharp Butte beyond a reasonable doubt insured he would be found guilty of killing Stranger Horse and to establish Boyles was the driver the State had to convince the jury to believe Sharp Butte's testimony

and her second story to Agent McConaghy. The necessity of convincing the jury that Sharp Butte was telling the truth to obtain Boyles' conviction was recognized by the court on direct appeal: "... the jury apparently believed Sharp Butte, the only eyewitness to the murder. Boyles' conviction rests heavily upon her word. .... [A] witness's trustworthiness is a question for the jury, and the jury obviously concluded Sharp Butte was truthful when she said Boyles was driving." *Boyles*, 567 N.W.2d at 862. Although Agent McConaghy did not use the phrase Boyles "is guilty," his testimony that "[t]here was never any indication that anyone else was driving the car other than Jason[,]" informed the jury Agent McConaghy believed Boyles was guilty and he believed Sharp Butte was the passenger. (Trial T. at 882.)

Although Agent McConaghy did not specifically say "I believe Sharp Butte is telling the truth," Agent McConaghy's testimony amounted to that when he testified her second story was consistent with what he believed happened. He also testified he believed Boyles was the driver when Stranger Horse was killed. Agent McConaghy's testimony expressed a personal opinion about both Sharp Butte's credibility and Boyles' guilt. Thus, the testimony elicited by the State constituted improper bolstering of or vouching for Sharp Butte's credibility because Agent McConaghy "expresse[d] a personal opinion about the credibility of a witness." *United States v. Santana*, 150 F.3d 860, 862-63 (8th Cir. 1998).

Despite the above finding that Agent McConaghy's testimony constituted improper vouching or bolstering of Sharp Butte's testimony, the Court does not find the appellate habeas court's decision "is contrary to or involved an unreasonable application of, clearly established Federal law *as determined by the Supreme Court of the United States.*" 28 U.S.C. § 2254 (emphasis added). Boyles did not cite and the Court did not locate a Supreme Court decision that would require the appellate habeas court to grant Boyles a new trial on the grounds of improper bolstering or vouching of a witness by another witness.[10] Moreover, the Court does not find the appellate habeas court's

---

[10]The Court notes there are Eighth Circuit Court of Appeals' decisions regarding improper vouching for the credibility of witnesses that would support Boyles' claim of improper vouching by the FBI Agent. *See Westcott v. Crinklaw*, 68 F.3d 1073,1075-77 (8th Cir. 1994) (reversing and remanding

36

decision was based on an unreasonable application of the facts in light of the evidence presented in the state court proceeding. Thus, Boyles has not established he is entitled to relief under 28 U.S.C. § 2254.

Trial counsel failed to appeal the issue of improper bolstering or vouching by Agent McConaghy. During the state habeas hearing he admitted he should have included this issue in the direct appeal. (Habeas Hearing T. at 108.) As explained above, the appellate habeas court concluded, however, that Agent McConaghy did not improperly bolster or vouch for Sharp Butte's credibility. *Boyles*, 677 N.W.2d at 549-50. Because the appellate habeas court is the same court that would have decided the issue on direct appeal, and that court ruled against Boyles on the merits in the habeas action, Boyles did not suffer any prejudice from trial counsel's failure to include that issue on direct appeal. Thus, Boyles has not shown he received ineffective assistance of counsel for failure to appeal improper bolstering or vouching by the FBI Agent. *See Strickland*, 466 U.S. at 694 (holding that the prejudice prong is met when the defendant shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

## F. Failure to object to vouching by prosecutor in closing argument

During closing argument the prosecutor made the following statements, which Boyles contends, and the State does not dispute in the present action, were improper vouching:

1) "I suggest there is no reason to disbelieve [Agent McConaghy]."

2) "[Agent Rawalt] told it just the way it happened."

3) "[S]he's telling the truth."

---

for a new trial where the accuracy of a witness's statements was the issue upon which the case turned, and absent the improper bolstering of the witness's testimony, the jury might not have reached the same verdict); *United States v. Whitted*, 11 F.3d 782, 785-87 (8th Cir. 1993) (reversing jury's verdict because expert's testimony invaded the jury's exclusive province to decide witness credibility); *United States v. Azure*, 801 F.2d 336, 340-41 (8th Cir. 1986) (reversing and remanding because a doctor vouched for the credibility of the young victim and considering the strength of the government's case and the importance of the victim's credibility, the court could not find the improper vouching was harmless error).

4) "I think the state proved its case."

5) "I think we proved beyond a reasonable doubt that Jason Boyles killed that man ... I think we ... proved ... he is guilty of ... second degree."

*Boyles*, 677 N.W.2d at 550. Within the first few moments of his closing argument, the prosecutor began vouching for the evidence: "Now, I think what I'll do is kind of walk through the testimony of some of the witnesses in this case. And suggest to you what I think we proved by that." (Trial T. at 1353.) Trial counsel objected to the prosecutor's vouching and asked that the court "remind" the prosecutor not to do that. (*Id.*) The trial court sustained the objection and reminded the prosecutor "it doesn't matter what you think, it's what the jury thinks. .... So it's not appropriate for you to think they ought to find him guilty because you think it is." (Trial T. at 1353-54.) The prosecutor continually engaged in vouching despite the trial court's order, just as he continued to ask leading questions throughout the trial despite several objections and warnings by the trial court.

During the habeas hearing, trial counsel admitted the prosecutor's statements were vouching and that he did not appeal that issue. Contrary to the appellate habeas court's decision on the issue of improper bolstering or vouching by the FBI Agent in which the court ruled on the merits of that claim, the appellate habeas court did *not* deny relief on the ground that the prosecutor's statements did not amount to improper vouching. Rather, the appellate habeas court assumed the prosecutor's statements constituted improper vouching, but still denied relief because failure to appeal this issue was a "tactical decision made by trial counsel based on his beliefs regarding which issues were best for appeal." *Boyles*, 677 N.W.2d at 550.

The Supreme Court explained that two dangers are present where prosecutors vouch for the credibility of witnesses and express their personal opinions of the accused's guilt:

> [S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

38

*United States v. Young*, 470 U.S. 1, 18 (1985). The latter danger is the one most applicable to the statements the prosecutor made in this case. It is also significant that Boyles' trial counsel did not invite the vouching statements by the prosecutor in the present case as the defense counsel in *Young* had done.

The prosecutor's closing argument in this case was replete with improper vouching. He began vouching for the evidence near the outset of his closing argument and, despite the trial court's admonition to discontinue vouching, he continued to tell the jury throughout his closing argument that he believed the State had proven Boyles was guilty and that witnesses who testified for the State told the truth during the trial. The Supreme Court cautioned that "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. .... [T]he Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." *Young*, 470 U.S. at 11-12. The evidence against Boyles in this case was not overwhelming and there were several errors in this case examined in this opinion, which resulted in Boyles' trial not being a "fair proceeding." The Court concludes based upon a review of the entire record in this case that the prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning Boyles' guilt carried with it the "imprimatur of the Government and may [have] induce[d] the jury to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18.

The appellate habeas court concluded failure to appeal this issue of improper prosecutorial vouching was "a tactical decision made by trial counsel based on his beliefs regarding which issues were best for appeal." *Boyles*, 677 N.W.2d at 550-51. This finding is not supported by trial counsel's testimony at the state habeas hearing. Rather, he admitted the prosecutor's statements were improper vouching. Trial counsel did testify he made tactical decisions not to object to every error the prosecutor made because "at some point you may transfer the jury some impression you're trying to hide something." (Habeas T. at 96.) But he did not testify he made a tactical decision not to appeal the issue of improper vouching by the prosecutor or that he believed it was not a good issue

to pursue on appeal. The failure to appeal this issue constituted deficient performance by trial counsel and based upon the Court's discussion above, Boyles was prejudiced by this failure because he would have been entitled to a new trial on his direct appeal. *See Strickland*, 466 U.S. at 687. Regarding the prejudice finding, this claim is distinguishable from Boyles' claim of improper bolstering or vouching by the FBI Agent. The Court did not find prejudice for failure to appeal the issue of improper bolstering or vouching by the FBI Agent because the South Dakota Supreme Court ruled against Boyles on the merits of the FBI Agent vouching claim in the habeas action and there is no contrary law from the United States Supreme Court. Thus, even if trial counsel had appealed the issue of bolstering or vouching by the FBI Agent, Boyles would not have prevailed. But there is no similar ruling by the South Dakota Supreme Court *on the merits* of Boyles' claim of improper vouching by the prosecutor that would preclude a finding of prejudice on this claim. Rather, the appellate habeas court assumed the prosecutor's conduct did amount to improper vouching. The appellate habeas court assumed the failure to appeal the prosecutorial vouching was a tactical decision. The habeas record does not support that conclusion. Absent any support for that assumption, the failure to appeal that issue was a serious and prejudicial oversight.

Based upon the above discussion, the appellate habeas court's decision that trial counsel did not render ineffective assistance of counsel for failure to appeal the issue of improper prosecutorial vouching is both an unreasonable application of clearly established Federal law as determined by the Supreme Court in *Strickland*, 466 U.S. at 687, and *Young*, 470 U.S. at 11-12 and 18, and it was based on an unreasonable determination of the evidence presented in the state habeas hearing. 28 U.S.C. § 2254(d)(1), (d)(2). Therefore, Boyles is entitled to habeas relief on this ground of ineffective assistance of counsel.

## G. Failure to object to material leading questions by prosecutor and appeal denial of mistrial for prosecutor's improper use of leading questions

The trial record in this case is rife with leading questions by the prosecutor, not simply on insignificant issues, but in crucial areas of testimony. The appellate habeas court summarized the prosecutor's use of leading questions: "The State asked leading questions on virtually every

substantive issue from who was driving that evening to the witness' demeanor on the stand." *Boyles*,
677 N.W.2d at 551. The Court will set forth a few of the more egregious examples of the State's
improper leading questions.

The prosecutor gave Sharp Butte the opportunity to answer a non-leading question about any
conversation she had with Boyles after seeing Stranger Horse walking along the road, but the
response was not favorable to the State and the prosecutor then altered her statement by using a
leading question:

Q.   What was your conversation?

A.   Jason said *to give* him a ride.

Q.   To give him a ride?

A.   Yeah.

...

Q.   Who was driving the car?

A.   Jason

Q.   He said, *should we* give him a ride?

A.   Yeah.

(Trial T. at 39.) There is a significant difference between Jason saying "to give him a ride" and
Jason asking "should we give him a ride." The first statement is only consistent with Sharp Butte
being the driver and Jason being the passenger. The way the prosecutor rephrased her testimony into
a question, however, could be consistent with Jason being either the passenger or the driver.

Later in her testimony, Sharp Butte repeated the statement that Jason said to give the man a
ride, which the prosecutor turned into a leading question on the question of intent:

Q.   All right. When Ron Stranger Horse was walking down the road going south
     and Jason and you were going north, did Jason say anything to you before he turned
     the car around the same direction that –

A.   Just to give him a ride.

Q.   Did he say, watch this?

| | |
|---|---|
| A. | When we turned around? |
| Q. | Didn't he use the words "watch this" at some time during that thing? |
| A. | Before he hit him? |
| Q. | Before you hit him? |
| A. | Yeah. |
| ... | |
| Q. | And as he approached him, he said, "Watch this"? |
| A. | Yeah. |
| Q. | Is that your testimony? |
| A. | Yeah. |

(Direct Examination of Harvi Lynn Sharp Butte T. at 41-42.)  Trial counsel did not object to any of these leading questions on crucial issues.  It was not until the above leading questions were already asked and answered that trial counsel said, "Object to the testimony from the State's Attorney, your Honor.  I mean, I'm being very generous in letting him do all the testimony in a leading –." (*Id.* at 43.)  The objection was sustained.

It is interesting to note that the Respondent, the habeas court and the appellate habeas court repeatedly refer to Stranger Horse's death as an "accident."  Boyles, however, was convicted of an intentional murder based at least in part upon the words "watch this," which were spoken by the prosecutor, but not once uttered during the trial by Sharp Butte who supposedly heard Boyles say those words before Stranger Horse was hit by the car.

During the habeas hearing, trial counsel said "If I had to do over, I would object to every one of [the leading questions]." (Habeas T. at 96-97.)  But, trial counsel also explained the reasons he made a conscious decision not to object to all of the prosecutor's leading questions.  First, trial counsel has experience with this prosecutor and explained, "he leads a lot and when you make objections, it seems to continue." (Habeas T. at 93.)   Second, the reason for not continually objecting was: "And I think at some point when you are objecting at a trial, that a jury can get some type of an opinion that maybe you're trying to hide something." (Habeas T. at 93.)

The prosecutor's habit of using leading questions is either a tactic to gain an unfair advantage over criminal defendants who's attorneys are concerned about juries believing they have something to hide or he simply has been getting away with asking leading questions to the point it is a habit he cannot break. (*See, e.g.,* Trial T. at 886, 888; Direct Examination of Harvi Lynn Sharp Butte T. at 38-44.) Trial counsel explained the frustration about the prosecutor's use of leading questions and the quandary that put him in as defense counsel: "I can object, sustain, next question, it's leading, object, sustain, and it just kind of went on and on and on. I objected a lot more on the first trial to the leading questions than I did on the second, but it didn't seem to do any good. It never stopped it." (Habeas T. at 99.) As examples, the prosecutor was either unable or unwilling to ask a non-leading question immediately after the trial judge warned him the examination of two witnesses on the stand would be terminated if he asked one more leading question. (Trial T. at 923-24; Cross Examination of Harvi Lynn Sharp Butte T. at 29.)  The trial court did finally terminate his examination of Agent McConaghy for using leading questions, but that was not until nearly the end of the State's examination of him. (Trial T. at 924.)

Despite the prosecutor's repeated use of improper leading questions and trial counsel's failure to object or appeal the denial of a mistrial for improper use of leading questions, the appellate habeas court declined to "second-guess counsel's strategy and tactics regarding objections and issues for appeal." *Boyles*, 677 N.W.2d at 551. Trial counsel was placed in an untenable position due to the prosecutor's continued use of improper leading questions despite objections and the trial court's admonitions, but that was no fault of trial counsel. The Court does not find the appellate habeas court's finding that Boyles failed to establish trial counsel was not acting as counsel guaranteed by the Sixth Amendment is contrary to or an unreasonable application of clearly established Federal law or that it was based on an unreasonable determination of the facts presented in the state court proceeding. Thus, relief under 28 U.S.C. § 2254 cannot be granted on this ground. It should be noted, however, that such continued and unchecked improper questioning by the prosecutor contributed to this not being a fair trial on these murder charges. There are remedies available if a trial court's rulings are not heeded.

43

**III.    Denial of New Trial Based on Newly Discovered Evidence**

The final ground for relief advanced by Boyles is that the appellate habeas court erred in denying a new trial based on newly discovered witnesses. This claim is based upon all of the witnesses that were presented by Boyles during the state habeas hearing, which included people who saw Sharp Butte driving within the hour of Stranger Horse's death and people who heard Sharp Butte make post-trial statements that she had killed a man by running over him. Additionally, Boyles relies upon the witnesses that testified at the federal evidentiary hearing, who he intended to call at the state habeas hearing, but were not available to testify at that hearing.

The Respondent argues the Court cannot consider Boyles' newly discovered evidence because there was no independent constitutional violation occurring in the state criminal proceeding. This argument is based on the Supreme Court's holding that, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). The Respondent's argument is that there were no constitutional violations in the state criminal trial, so a federal habeas court cannot consider Boyles' claim of actual innocence. As determined by the Court above, however, there were constitutional violations in Boyles' state criminal trial. Therefore, the Court will consider Boyles' newly discovered evidence claim. This claim will be considered under 28 U.S.C. § 2254(d)(2), which provides that relief cannot be granted on a claim decided on the merits in state court proceedings unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

The Court notes the South Dakota Supreme Court has recognized that, "[i]f they receive a fair trial in the first instance, convicted defendants bear a heavy burden in obtaining a new trial based on newly discovered evidence." *State v. Gehm*, 600 N.W.2d 535, 540 (S.D. 1999). The Court further notes that based upon the findings of constitutional error explained above, Boyles did not receive "a fair trial in the first instance."

44

## A. Newly discovered evidence of witnesses that saw Sharp Butte driving Boyles' car

After refusing to substitute its judgment regarding credibility of Boyles' habeas witnesses for the habeas court's credibility determinations, the appellate habeas court found the testimony at the habeas hearing failed to meet the criteria for granting a new trial because the testimony of the Youngmans, Brill and Bear Heels, who testified they saw Sharp Butte driving Boyles' car the morning of Stranger Horse's death, could have been discovered before the trial. *See Boyles*, 677 N.W.2d at 540.

There is a significant error in the appellate habeas court's recitation of the standard for granting a new trial based on newly discovered evidence as it relates to the witnesses who testified they saw Sharp Butte driving the Boyles' car the morning of Stranger Horse's death, three of whom saw her driving within an hour of his death. The first requirement the appellate habeas court stated Boyles had to show to obtain relief was that "'[t]he evidence was *undiscoverable* by the movant at the time of trial.'" *Boyles*, 677 N.W.2d at 540 (quoting *State v. Gehm*, 600 N.W.2d 535, 540 (S.D. 1999)) (emphasis added). Based upon this requirement, the court denied relief as to the witnesses that observed Sharp Butte driving the Boyles' car: "As the State points out, Youngman, Brill and Bear Heels all testified that they observed Sharp Butte driving on the morning of the accident. If true, this testimony could have been discovered prior to trial." *Id.* The case cited by the appellate habeas court for this standard is *State v. Gehm*, 600 N.W.2d 535, 540 (S.D. 1999). Contrary to the statement in *Boyles*, the first requirement set forth in *Gehm*, is that "the evidence was *undiscovered* by the movant at the time of trial." *Id.* (emphasis added). In this case, the significant error is that the appellate habeas court held Boyles to a higher standard, which is the evidence was "undiscoverable," compared to the correct standard, which is the evidence was "undiscovered." If the standard was "undiscoverable" the appellate habeas court would be correct that Boyles did not meet the standard, because clearly these witnesses testified to events that occurred before the trial and, thus, it was *possible* to discover their testimony before Boyles' trial. Under the correct standard, however, it is undisputed Boyles had not discovered the witnesses before either of his trials. Accordingly, Boyles would meet the first requirement for relief based upon newly discovered evidence, as the standard is correctly stated in *Gehm*, 600 N.W.2d at 540.

45

Before addressing the remaining elements of Boyles' newly discovered evidence claim, the Court will summarize the testimony of the Youngmans, Brill and Bear Heels, who testified at the state habeas hearing to seeing Sharp Butte driving Boyles' car the morning Stranger Horse was killed. Mia Youngman testified at the habeas hearing in circuit court that on the morning Stranger Horse was killed she had stayed overnight with her friend, Nola Brill. Mia had to be to work by 7:00 a.m., so she was driving to her home early in the morning as it was just getting light out. As she was entering Horse Creek, she saw Boyles' car sitting at the stop sign leaving Horse Creek. She clearly saw both Boyles and Sharp Butte in Boyles' car. She saw Sharp Butte driving and Boyles sitting in the passenger's seat. The windshield to the car was not broken when she saw Sharp Butte driving. She further testified that at one time she was married to someone related to Boyles and she considers him a friend of hers. Mia also knew Sharp Butte from living in the community. When asked why she didn't tell anyone she saw Sharp Butte driving, Mia said, "I didn't want to get involved. I didn't know it was –." (Habeas T. at 33.)

Kevin Youngman also testified at the habeas hearing. He is a "pretty good friend" of Boyles, and he knew Sharp Butte from seeing her around and occasionally meeting her. On the morning Stranger Horse was killed, Kevin was sitting outside of his home at it was getting light out. He was waiting for his wife, Mia, to return home and he had been drinking. He saw Sharp Butte driving a car with Boyles and two other girls in it. It was getting light out when Kevin saw Sharp Butte get in the driver's seat and go for a ride. Kevin had been prosecuted by the prosecutor and had been sentenced to serve time at the penitentiary. When asked by the prosecutor, "You're – you don't like me too good, do you, because –" Kevin answered, "Not really." This is the only witness that expressed a dislike for the prosecutor, contrary to the habeas court's statement that "*many* of the Petitioner's witnesses or their close friends/relatives had been prosecuted by the prosecutor that prosecuted the Petitioner and certainly held a personal dislike for the prosecutor and this affected their credibility regarding this matter." (Habeas record at 273 (emphasis added).) Again it must be remembered this witness would be compared primarily to Sharp Butte in deciding if this witness' testimony would tend to help show the likelihood that the outcome of Boyles' trial would have been different.

46

Nola Brill testified that on the morning of Stranger Horse's death, she saw Sharp Butte driving the Boyles' car after the windshield had been damaged. Brill worked at the White River Nursing Home at that time and had to be to work by 7:00 a.m. and she thought she saw the damaged Boyles' car around 6:00 a.m. She knows both Sharp Butte and Boyles, as well as Boyles' father. Although she knows the Boyles family, she does not associate with them. She told John Boyles she had seen Sharp Butte driving, but she did not tell him until after Boyles was convicted. On cross examination, Brill admitted the prosecutor had prosecuted her and her son. Brill's son was in the penitentiary at the time of the habeas hearing. When the prosecutor asked her, "So you probably don't like me too good, do you?," she answered "I never disliked you." (Habeas T. at 61.)

Bear Heels testified she knows who Boyles is but she is not friends with him. She testified on direct examination that she saw Sharp Butte driving Boyles' car at approximately 4:00 a.m. the morning Stranger Horse was killed. On cross-examination she said she identified Sharp Butte by her "ugly red hair," rather than her face. In discrediting Bear Heels' testimony, neither the habeas court nor the appellate habeas court mentioned there is no evidence in the record that anyone who was seen in Boyles' car in the hours preceding Stranger Horse's death, other than Sharp Butte, had red hair.

Another witness Boyles subpoenaed to testify at the habeas hearing was Imadeen White Buffalo. She was expected to testify that the morning Stranger Horse was killed she saw Boyles' car parked on Highway 83 with a cracked windshield with Boyles sitting in the passenger seat, no one in the driver's seat and Sharp Butte walking with another person away from the car. She did not honor her subpoena, however, and Boyles asked for a continuance of the hearing to present her testimony along with the other witnesses that did not honor their subpoenas. In his brief to the habeas court, Boyles discusses an Affidavit of White Buffalo and indicates it was an exhibit at the habeas hearing. The appellate habeas court referred to several affidavits produced by Boyles at the habeas hearing, *Boyles*, 677 N.W.2d at 536, as being "introduced" at the habeas hearing. The affidavits were not received into evidence at the habeas hearing, however, and thus were not properly before the appellate habeas court in evaluating Boyles' claim of ineffective assistance of counsel.

47

The appellate habeas court addressed the first requirement but did not address the remaining three elements of the test for granting a new trial based on newly discovered evidence as it relates to the testimony of the Youngmans, Brill and Bear Heels. The second requirement is that the evidence is "material, not merely cumulative or impeaching." *Gehm*, 600 N.W.2d at 540. It is clear on this record that evidence of three witnesses seeing Sharp Butte driving the Boyles' vehicle within an hour of Stranger Horse's death and another seeing her driving at 4 a.m. is material. None of these witnesses saw who was driving at the moment Stranger Horse was killed, but these witnesses would have corroborated Boyles' hypnotically-recalled memory that Sharp Butte was driving when the car struck Stranger Horse. In the direct appeal, the court found it material that in its review of the evidence "only Boyles was seen behind the wheel that morning," *Boyles*, 567 N.W.2d at 862, thus recognizing the importance of evidence showing who was driving the Boyles' car near the time Stranger Horse was killed. Moreover, testimony from these witnesses could not be classified as merely cumulative or impeaching to the evidence offered at trial, because aside from Boyles' hypnotically recalled memory, this would have been the only eyewitness evidence of Sharp Butte driving Boyles' car on the morning of Stranger Horse's death.

The Court will address below the third requirement, that this evidence "would probably produce an acquittal," in considering all of the newly discovered evidence. The fourth requirement was stated incorrectly in the appellate habeas court's decision, but it did not affect the decision to deny relief on the newly discovered evidence claim. *Boyles*, 677 N.W.2d at 540. The appellate habeas court cited the fourth requirement as "'[n]o lack of diligence caused the movant to fail to *disclose* the evidence earlier.'" *Id.* (quoting *Gehm*, 600 N.W.2d at 540) (emphasis added). The correct statement of the fourth requirement is that "no lack of diligence caused the movant to fail to *discover* the evidence earlier." *Gehm*, 600 N.W.2d at 540 (emphasis added). The appellate habeas court made the finding that trial counsel's investigation was not deficient and that both trial counsel and his law-trained private investigator conducted an extensive investigation. Although the Court expressed concerns about one aspect of the effectiveness of trial counsel's investigation, the Court did not find the appellate habeas court's finding that the trial counsel conducted an adequate investigation was clearly erroneous. It appears from the record at the habeas hearing that trial

48

counsel and his investigator, who were well-qualified, were diligent in trying to find evidence of Sharp Butte driving the Boyles' car the morning of Stranger Horse's death. Thus, the record demonstrates Boyles satisfies the fourth requirement for a new trial based on newly discovered evidence.

### B. Newly discovered evidence of witnesses that heard Sharp Butte admit to killing a man by running over him

Boyles called Rodell Murphy, Margaret Hopkins, Roy Moran, Sr., and Mark Good Shield to testify at the habeas hearing about statements Sharp Butte made after Stranger Horse was killed. The habeas court's decision regarding the witnesses who testified they heard Sharp Butte make admissions she was driving was that, "[t]he additional 'newly-discovered exculpatory' evidence presented at the October 3, 2002, Habeas hearing is not credible. Based on the Court's observation of the demeanor of the witnesses who testified about admissions allegedly made by Harvi Lynn Sharp Butte, this Court concludes the evidence does not undermine the Court's confidence in the verdict, nor does the evidence require a new trial." (State Habeas record at 271.) The habeas court made this determination regarding credibility of Boyles' witnesses without having seen Sharp Butte testify at Boyles' trial and did not explain how Boyles' witnesses' credibility compared to Sharp Butte's credibility or the credibility of the other witnesses at Boyles' trial.

The appellate habeas court held that, "[t]he testimony of Hopkins, Murphy, the Morans and Good Shield is unlikely to produce an acquittal given the substantial credibility problems each witness presented." *Boyles*, 677 N.W.2d at 540. The reference to "the Morans" includes Roy Moran, Sr., who's testimony is summarized below, and Peggy Moran, who testified that one of the trial witnesses, Gloria Moran, told her something different than what she testified to at the trial. At trial, Gloria testified she saw Sharp Butte get out of the passenger side of the Boyles' vehicle after the car was damaged, but Peggy testified Gloria told her shortly after the incident that she saw Sharp Butte exit the driver's side of Boyles' vehicle and that Boyles crawled out of the back seat of the car.

49

Margaret Hopkins heard Sharp Butte talking to her sister, Tanya Sharp Butte, in 1995 after Stranger Horse was killed. Both Sharp Butte and Tanya were "staggering drunk" and did not see Hopkins. (Habeas T. at 46.) Sharp Butte told Tanya she was scared and she couldn't handle it anymore. (Habeas T. at 40.) Tanya asked Sharp Butte why she was scared and Sharp Butte responded "'Because I was the one driving the car, ... and I hit that man and I just left. I drove off, and I got – put Jason over on the passenger's side when we came to a stop.'" (*Id.*) The appellate habeas court then found several things that lessened Hopkins' credibility. *Boyles*, 677 N.W.2d at 538. The first reason was that Hopkins overheard this conversation in August 1995, before Boyles' trial, but failed to tell anyone because she was scared and "didn't know who I was supposed to report it to." Hopkins later admitted she could have reported it to legal authorities. (Habeas T. at 43.)

The second reason the appellate habeas court questioned Hopkins' credibility was that she had a physical altercation with Sharp Butte a couple of years after she heard Sharp Butte say she was the driver. (Habeas T. at 41-42.) Hopkins testified Sharp Butte "came upon me," and they had a fight, but Hopkins "never said that I didn't like [Sharp Butte]." (*Id.* at 41-42.) The third reason to question Hopkins' credibility was that she didn't speak to habeas counsel until after Boyles' father arranged for her to speak to habeas counsel in 1998. She testified, however, that she did tell Paula Good Shield about hearing Sharp Butte say she was the driver. The fourth reason to question Hopkins' credibility was that "she had previously been charged with perjury." *Boyles*, 677 N.W.2d at 539. This finding is clearly erroneous, however, because Hopkins denied being charged with perjury and the State did not produce any evidence she was ever charged with perjury. (Habeas T. at 47.)

Facts boosting Hopkins' credibility are that she did not know who Boyles was, so she was not a friend or relative of Boyles. Moreover, Hopkins did not have a criminal record and, although the prosecutor solicited from other witnesses that he had prosecuted them, he never asked Hopkins that question. The prosecutor did not produce any evidence he had prosecuted any of Hopkins' friends or relatives. Also, Hopkins said she didn't want to get involved, but Agent McConaghy testified it is not unusual for people to avoid involvement in criminal investigations.

50